**The Law Office of Matthew Kumin, APC**
Matthew Kumin Esq. (SBN 177561)
3533 Boston Avenue
Oakland, CA 94602
415.655.7494
matt@mattkuminlaw.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN BROOKS,<br><br>Plaintiff,<br><br>v.<br><br>STREAMLINE FILM GROUP, LLC; EMILY HUNTER SALVERSON; EQUITABLE MEDIA, LLC; BLOOD FOR DUST PRODUCTION, LLC; TROY SMITH; PANDORA TAX LLC<br><br>Defendants. | Case No. 2:26-cv-11376<br><br>**Complaint and Demand for Jury Trial** |

Plaintiff Jonathan Brooks (the "Plaintiff") by way of Complaint against the Defendants Streamline Film Group, LLC, Emily Salverson, Blood for Dust Production, LLC, Troy Smith and Pandora Tax, LLC (collectively the "Defendants") says:

**PRELIMINARY STATEMENT**

1. This case is filed against the defendants for engaging in an ongoing scheme to sell "movie rights" for millions of dollars to various investors, which transactions they later claimed had never been consummated.

2. In the summer of 2021 the Plaintiff was referred to Troy Smith ("Smith") and Baker Tilley US LLP ("Baker Tilley") for financial and tax planning guidance in connection with a potential investment.

3. Smith and Baker Tilley subsequently introduced the Plaintiff and others to Streamline Film Group LLC ("Streamline") and its principal Emily Hunter Salverson

("Salverson"). Streamline, at the time, owned a single purposes entity known as Thomasville Pictures, LLC ("Thomasville"), which had purchased the rights to the film, *Bandit*; and was seeking to sell its ownership interest therein

4. Smith and Baker Tilley proposed that the Plaintiff purchase Thomasville's unregistered securities from Streamline. Neither Smith nor Baker Tilley were registered to sell securities under the Securities Exchange Act of 1934.

5. The film *Bandit* was a 2022 Canadian biographical crime film starring Josh Duhamel, Elisha Cuthbert, Nestor Carbonell and Mel Gibson.

6. In addition to its star and market appeal, Smith and Baker Tilley explained to the Plaintiff that investing in the movie or any other like film could come with the added financial and tax benefit afforded by Internal Revenue Code ("IRC") Section 181. [1]

7. To induce the Plaintiff to purchase the securities offered by the Defendants Smith, Baker Tilley, as well as the "sellers" of the movie, Streamline, Salverson, Thomasville, Ryan Smith and his partner Allen Cheney expressly represented that the Plaintiff and others, through a closely held LLC would obtain sole, unencumbered title to the movie, *Bandit*.

8. Based thereon Plaintiff and others invested more than $16,000,000 to acquire the rights to the movie *Bandit*.

9. Thereafter, the present Defendants solicited the Plaintiff and others to invest in a similar project, a second movie known as "Blood for Dust". The proposal mirrored the one in connection with the movie *Bandit*.

10. When this latest film was pitched to Plaintiff as an investment opportunity, Smith had relocated his practice to his newly formed company, Pandora Tax LLC ("Pandora").

11. Each of Defendants represented that the Plaintiff and others, would purchase an entity known as BFD Film Project, LLC ("BFD"), which had procured "title" to the movie, *Blood for Dust*. See Exhibit A. The structure and tax strategy were virtually identical to the transaction involving the movie *Bandit*.

[1] The benefit offered by Section 181 was that it allowed the investors an immediate deduction for production and other costs that would be otherwise capitalized under the Internal Revenue Code.

12. *Blood for Dust* was an action thriller starring Kit Harrington, Scott McNairy and Josh Lucas. See Exhibits B and C. The movie received worldwide acclaim, and was nominated for Best International Film, while glowing reviews from Variety and the Hollywood Reporter, among others, were published.

13. In consummating the transaction, the Defendants solicited and sold securities to the Plaintiff in an unregistered securities offering.

14. Notwithstanding the express representations of each of the Defendants and the consideration paid to procure title to the movie *Blood for Dust*, the Plaintiff were suddenly advised in October of 2025, by Smith and Pandora, that title to the film had never been procured; and the entire transaction was "illusory".

15. Plaintiff was told the exact same thing in connection with his investment in the movie *Bandit*.

16. As a result, Plaintiff initiates this action for, *inter alia*, violation of various securities laws (including securities fraud), breach of contract, negligent misrepresentation, fraud, and professional malpractice.

**THE PARTIES**

17. Plaintiff Jonathan Brooks ("Brooks") is a resident of the State of Florida with his primary office address being located at 13475 Atlantic Boulevard, Jacksonville, Florida 32225.

18. Streamline is a limited liability company organized under the laws of the State of California with offices located at 3960 Howard Hughes Parkway Suite 500, Las Vegas, Nevada 89169.

19. Salverson is the Managing Member of Streamline and a member thereof, with her primary office address being 5348 Vegas Drive, Suite 1371, Las Vegas, Nevada 89108.

20. Blood for Dust Productions LLC is a limited liability company with offices located at 3332 N 27th Street, Bozeman, Montana 59718.

21. Equitable Media, LLC ("Equitable") is a limited liability company organized under the laws of the State of California with offices located at 5348 Vegas Drive, Suite 1371, Las Vegas,

Nevada 89108. Based on information and belief, Equitable's sole member and Manager is Salverson.

22. Smith is a former partner with Baker Tilley and is the founder and sole member in Pandora Tax, LLC ("Pandora") and maintains his primary office at 6353 Corte De Alberto Suite B103, Carlsbad, California 92011.

23. Pandora is a limited liability company, organized under the laws of the State of California with offices located at 6353 Corte De Alberto Suite B103, Carlsbad, California 92011. Based on information and belief, Smith is the sole member of Pandora.

**JURISDICTION & VENUE**

24. This Court has exclusive jurisdiction, pursuant to 28 U.S.C. §1331 over Plaintiff claims under Section 10(b) of the Securities Exchange Act of 1934, as amended ("**1934 Act**"), Rule 10b-5 promulgated under the 1934 Act ("**Rule 10b-5**"), and current jurisdiction pursuant to 15 U.S.C. 77aa under the 1934 Act.

25. This Court has ancillary jurisdiction over Plaintiff common law, statutory and state relate claims pursuant to 28 U.S.C. §1367 as they arise from a common nucleus of operative facts as the main federal claims.

26. This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a) as the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

**STATEMENT OF FACTS**

A. Plaintiff's Business Background; and Introduction to Smith & Halverson

27. Plaintiff and his wife, Brittany, were previously investment bankers who later co-founded one of the fastest growing realty companies in northern Florida.

28. In the course of considering various business and investment opportunities the Plaintiff was referred to Smith, a partner at Baker Tilley, for purposes of financial, tax and investment planning.

29. Smith and Baker Tilley subsequently introduced, solicited and recommended that the Plaintiff purchase unregistered securities of a Trusted Marketing Solutions, LLC, ("TMS"), which purportedly owned the rights to the film known as *Bandit.*

30. In fact, Smith and Baker Tilley presented Plaintiff with a detailed "pitch deck" explaining the benefits of such an acquisition.

31. Smith and Baker Tilley explained to the Plaintiff that investing in the movie had an added financial and tax benefit afforded by the Internal Revenue Code ("IRC") Section 181.The benefit of Section 181 was that the investors could receive an immediate deduction for production costs that would typically be capitalized under the Internal Revenue Code.

32. According to Smith and Baker Tilley, IRC Section 181 permitted taxpayers to elect to deduct up to $15 million of production costs of a "qualified film," television production, or live theatrical production ($20 million if produced in certain distressed areas).

33. Smith and Baker Tilley represented to the Plaintiff that "ownership" of the company that owned the film, TMS, and *Bandit* would vest in the Plaintiff pursuant to the transaction they were soliciting, recommending and vetting.

B. Acquisition of the Film-*Bandit*

34. Upon the solicitation, advice and recommendation of Smith and Baker Tilley the individual Plaintiff entered into negotiations to purchase TMS unregistered securities and the film, *Bandit*.

35. Smith and Baker Tilley recommended that they could serve as the Plaintiff's representatives during the negotiations to acquire TMS and the film *Bandit* from Streamline, and would complete all necessary due diligence.

36. At all relevant times, Smith and Baker Tilley negotiated and informed the Plaintiff with respect to the purchase of the film, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; and (iii) advising Plaintiff with respect to ongoing tax matters.

37. However, based on information and belief, neither Smith, nor Baker Tilley was a registered broker/dealer.

///

///

38. In exchange for their introduction to Salverson and TMS, leading the negotiations and due diligence process in connection with the purchase of the company and the movie, Baker Tilley received compensation from each of the Plaintiff.

39. To purchase the unregistered TMS securities and the rights to the film, Plaintiff agreed to pay to Streamline and the original owner of the film, Thomasville Pictures, LLC ("Thomasville"), the sum of $16,997,286 (the "Purchase Price") at the recommendation of Smith and Baker Tilley.

40. The purchase price was paid by Plaintiff making an initial deposit of $2,073,250 and executing a promissory note in the amount of $14,633,687 (the "Promissory Note").

41. Smith and Baker Tilley specifically advised each Plaintiff that the purchase price was fair and reasonable.

42. Upon the advice, guidance and recommendation of Smith and Baker Tilley the Plaintiff entered into the following agreements:

(i) Agreement to Purchase Single Purpose Entity.

(ii) Agreement to Purchase Film.

(iii) Agreement to Assume Promissory Note.

(iv) Promissory Note, annexed.

(v) BFD Operating Agreement.

(vi) Distribution Agreement.

Based on information and belief, Smith and Baker Tilley were advising and representing one or more of the Defendants with respect to the transaction.

C. <u>*Blood for Dust*; the Acquisition Agreements</u>

43. Following the sale of the interest in the movie *Bandit*, Smith left Baker Tilley.

44. In the months that followed Smith introduced and solicited Plaintiff and others to invest in the movie *Blood for Dust*.

45. Once again, Smith directed the course of negotiations, due diligence and documentation of the sale.

46. The documents presented to the Plaintiff were virtually identical to the documents he executed in connection with the acquisition of the movie *Bandit*.

47. Neither Smith, nor Pandora were licensed broker/dealers under federal or state law.

48. The first Agreement entered into by the Plaintiff , at the recommendation of Smith and Pandora was the Agreement to Purchase a Single Purpose Entity (the “SPE Agreement”) pursuant to which they acquired BFD Film Project LLC (‘BFD”) from Streamline.

49. The SPE Agreement expressly provided that the:

> The Film is the only asset of the Film Company. The Film Company has no other debts of any kind and Buyer is not assuming any other debts related to or connected to the Film or Film Company other than the assumption of the Purchase Money Note owed to Blood for Production LLC, in the amount of $9,940,765 and the performance and payment schedule provided in the <u>Film Purchase Agreement</u>. 'The acquisition of the Film Company *results in the transfer of all right, title and interest in and to the Film. The term all "right, title and interest" includes but is not limited to the ownership of the actual master Film file(s)* whether digital or stored on other media; the sound track; all recorded audio files; the copyright interest in the Film; the name of the Film; the script and all amendments; dailies, out-takes, behind the scenes footage; distribution and promotional rights; advertising and promotion materials; licensing rights; merchandising rights; state film tax credits (if any), and all other related materials of value used in the production of the Film. Seller agrees that by signing this Purchase Agreement, that it transferring, conveying and assigning its entire economic interest in the Film. Therefore, Seller agrees that Buyer is entitled to receive the distributions, allocations of income, gains, losses, deductions, credit, or similar items that are related to the Film production.

50. Moreover, the SPE Agreement further stated that Seller had no other obligations, liens, judgments, debts, or encumbrances of any kind that were payable to any other third party other than obligations provided under the <u>Performance and Payment Schedule</u>.

51. Pursuant to the SPE Agreement the Plaintiff and others agreed to pay $9,073,435 as provided for in the second agreement, the Film Purchase Agreement (the “Purchase Agreement”).

52. The SPE required the Plaintiff and others to make an initial payment toward the purchase price of $1,587,625.

53. The balance of the purchase prices of $7,940,765 was paid pursuant to the terms of the Promissory Note, which the Plaintiff personally agreed to assume from Streamline. Pursuant to

their Assumption Agreement the Plaintiff committed to pay the foregoing amounts due under the Promissory Note to Blood For Dust Productions LLC. [2]

54. To induce the Plaintiff to purchase BFD and the movie *Blood for Dust*, Streamline and Halverson expressly represented that:

a) Seller has full power and authority to execute and deliver this Agreement and to perform Seller's obligations under it, and that this Agreement constitutes a valid and legally binding obligation of Seller.

b) Seller warrants that the execution and delivery of this Agreement and the consummation of the transaction will not constitute or result in a default under any other agreements.

c) Seller *owns the Film Company and the Film* (and all rights to the Film) *free and clear of any restrictions regarding transfer.*

55. The Purchase Agreement further expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

56. According to the Purchase Agreement the Plaintiff and others purchased the Film, including but not limited to not just the right, title and interest to the movie but all other related agreements, contracts, elements or components of the Film production.

57. The Plaintiff's obligation to close on the purchase of the movie was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film.*

See Exhibit D ¶13.

///

///

[2] The Promissory Note is a security as defined as a security under the Securities Act of 1933.

58. So critical was the foregoing provision that a breach of paragraph 13 was deemed a "material breach" of this Agreement and any other agreement entered into by and between Buyer and Seller and/or any other party that is a stipulated person related to Seller.

59. Smith and Pandora expressly represented to the Plaintiff that they had verified that exclusive and absolute ownership of the film was being transferred to them by Streamline.

60. As a result, Plaintiff assumed the terms of the Promissory Note pursuant to the terms of an Assumption of Promissory Note agreement, ("Assumption Agreement").

61. In connection with the foregoing, BFD then entered into a distribution agreement with Equitable to distribute the film world-wide.

62. Equitable was at all relevant times owned and controlled by Salverson.

D. <u>The Pillsbury Report</u>.

63. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury Winthrop, Shaw Pitman LLP ("Pillsbury") a New York based law firm to conduct an evaluation of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report").

64. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring to Streamline, the transaction involving TMS, BFD, and the Plaintiff according to Smith and Pandora.

65. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction".

66. The Pillsbury Report continued by concluding that the "entity" (BFD) never obtained true ownership of the movie. Instead, the "entity's" right were "limited" and the transaction failed to convey the benefits and burdens of ownership. <u>See</u> Exhibit G pg. 2.

67. The "analysis" further determined that the "note obligation was illusory". <u>See</u> Exhibit G pg. 2.

68. Thus, the "partners" determined the underlying transaction was "null and void". <u>See</u> Exhibit G pg. 2.

69. However, the "partners", that being the members of BFD, raised no such doubts or concerns, conducted no such analysis and reached no such determination. In fact, no one even spoke to the Plaintiff's when preparing the Pillsbury Report. The Pillsbury Report was orchestrated by Smith, Pandora and others.

70. Finally, in October of 2025 Plaintiff the other members of BFD were informed they had never acquired ownership or the rights to the movie *Blood for Dust*. The Plaintiff was advised by Smith and Pandora that what they had represented and recommended previously was wrong.

71. No forensic report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents and transaction failed to transfer title.

72. Based on the foregoing, Streamline, Salverson, Smith, Pandora and Equitable deliberately, recklessly and/or negligently conspired to mislead the Plaintiff in connection with the sale of BFD's unregistered securities.

73. Each of the Defendants further facilitated the sale of unregistered securities through fraudulent and misleading statements and omissions.

74. Based on the foregoing Streamline or Dust Productions, LLC remain the "owner" of the movie and are collecting all income derived therefrom.

**COUNT I**

Securities Fraud (Rule 10b-5)

75. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

76. At all relevant times Plaintiff was a client of Smith and Pandora.

77. In the course of considering various business and investment opportunities the Plaintiff was referred to Smith, a partner at Baker Tilley, and subsequently Pandora for purposes of financial, tax and investment planning.

78. Smith and Pandora subsequently introduced, solicited and recommended that the Plaintiff invest in the acquisition of a film known as *Blood for Dust*. As part of its solicitation to

induce Plaintiff to purchase the unregistered securities, Smith and Pandora presented Plaintiff with a detailed "pitch deck" explaining the benefits of such an acquisition.

79. Smith and Pandora explained to the Plaintiff that investing in the movie had an added financial and tax benefit afforded by the Internal Revenue Code ("IRC") Section 181.

80. The benefit of Section 181 is an immediate deduction for production costs that would be otherwise capitalized under the Internal Revenue Code.

81. According to Smith and Pandora, IRC Section 181 permitted taxpayers to elect to deduct up to $15 million of production costs of a "qualified film," television production, or live theatrical production ($20 million if produced in certain distressed areas).

82. However, Smith and Pandora represented that the deduction could only be claimed by the Plaintiff if they "owned" the production.

83. Based on the solicitation, advice and recommendation of Smith and Pandora the Plaintiff and others agreed to enter into negotiations to purchase the film, *Blood for Dust*, in part to obtain the benefits of Section 181 and because the cast selected projected a marketable and profitable film.

84. At no time during the negotiations or the transaction was a registration statement filed with the Securities and Exchange Commission ("**SEC**") in connection with the sale of securities or the Promissory Note. Moreover, neither Smith nor Pandora were registered broker/dealers or licensed to sell securities.

85. At all relevant times, Smith and Pandora solicited, negotiated and guided the Plaintiff with respect to the purchase of BFD' unregistered securities and the movie, through the use of interstate commerce, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; and (iii) advising Plaintiff with respect to ongoing tax matters.

86. To purchase BFD and the movie, Plaintiff and others agreed to pay the sum of $9,073,435 to Streamline at the recommendation of Smith and Pandora.

87. Smith and Pandora specifically represented and advised each Plaintiff that the purchase price was fair and reasonable and that the purchasers would receive title to the unregistered securities and the movie.

88. Upon the advice, guidance and recommendation of Smith and Pandora the Plaintiff entered into the following agreements:

(i) Agreement to Purchase Single Purpose Entity.

(ii) Agreement to Purchase Film.

(iii) Agreement to Assume Promissory Note.

(iv) Promissory Note.

(v) BFD Operating Agreement.

(vi) Distribution Agreement.

Drafts of certain relevant Agreements are annexed hereto as Exhibits D-F.

89. According to Purchase Agreement the Plaintiff and others purchased the movie as well as all other related agreements, contracts, elements or components of the film production.

90. The Plaintiff's obligation to close on the purchase of the movie under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film*.

See Exhibit D ¶15.

91. In addition to title to the movie, Streamline and Thomasville represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

92. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition. See Exhibit G.

93. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring to BFD and the movie, according to Smith.

94. Pursuant to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction". See Exhibit G pg. 2.

95. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership. See Exhibit G pg. 2.

96. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory". See Exhibit G pg. 2.

97. Thus, the "partners" determined the underlying transaction was "null and void". See Exhibit G pg. 2.

98. The "partners" that being the members of BFD (including the Plaintiff) never determined the "transaction" was "null and void". Critically, nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

99. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

100. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

101. The Defendants made each of the foregoing representations to the Plaintiff to induce them to enter into the Agreements; and then later attempted to lead them to believe they never purchased the movie.

102. The representations made by the Defendants were material and relied upon by the Plaintiff in executing the Agreements and purchasing the unregistered securities. The Defendants intended to deceive, manipulate and defraud the Plaintiff.

103. At the time the Defendants made the foregoing representations and opinions they were false or issued in recklessness in an extreme disregard from the standards of ordinary care.

104. Plaintiff reasonably relied thereon to his detriment and purchased the unregistered securities.

105. The Defendants representations and opinions directly led to the damages sustained by the Plaintiff.

106. By and through their conduct the Defendants have violated Rule 10b-5 promulgated under the 1934 Act.

107. SEC Rule 10b-5 is a federal regulation that makes securities fraud, lies, and deceptive trading practices illegal.

108. Pursuant to Rule 10(b)(5) and the Rules promulgated thereunder (17 CFR 240.10-5(b):

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

109. By and through their actions the Defendants have violated SEC Rule 10-b5 and the regulations promulgated thereunder. Specifically, the Defendants represented that the Plaintiff was obtaining clear title to the movie, would benefit from the distribution thereof and from certain tax benefits associated with their investment as detailed above.

110. Each of the material representations detailed above were untrue; and the Defendants used emails, wires and mail to implement a scheme to defraud the Plaintiff -including but not

limited to presenting them documents which suggested they would receive clear title and ownership of the movie.

111. As a result of the Defendants violation of SEC Rule 10(b)(5) and the regulations thereunder the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants, jointly and severally, for violation of Rule 10b-5, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT II**

Securities Registration - Section 12(a)(1)

112. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

113. Defendants, [through Streamline,] offered to sell, and sold, to the Plaintiff and others (i) equity interests in BFD and (ii) the Promissory Note in the amount of $7,940,765, each of which represent a "security" as defined under Section 2(a)(1) of the Securities Act of 1933, as amended ("1933 Act").

114. Defendants made such offers and sales through the means of various instruments of transportation or communication in interstate commerce or the mails to carry or transmit offering materials and sale documentation, including without limitation, a detailed "pitch deck" and delivery of the securities in connection with such sales.

115. The securities were not registered with the SEC nor was a proper prospectus delivered to Plaintiff in connection with the offer and sale of the securities, thereby violating Section 12(a)(1) of the 1933 Act.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants for violation of Section 12(a)(1) of the 1933 Act, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

///

///

## COUNT III

Securities Fraud-Section 12(a)(2)

116. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

117. Defendants offered to the Plaintiff securities which were not properly registered and failed, in fact, to meet federal registration requirements. Defendants are each a defined "seller" as they either attempted to passed title or solicited the sale of an unregistered security to the Plaintiff through a material misstatement or omission.

118. As detailed above, the Defendants representations in connection with the unregistered securities were deliberately, intentionally and recklessly inaccurate.

119. Specifically, to induce the Plaintiff and others to acquire the movie the Purchase Agreement expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

120. According to the Purchase Agreement the Plaintiff and others purchased the movie as well as all other related agreements, contracts, elements or components of the film production.

121. In fact, the Plaintiff's obligation to close on the purchase of the movie under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film.*

<u>See</u> Exhibit D ¶13.

122. In addition to title to the movie, the Defendants represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

123. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report"). <u>See</u> Exhibit G.

124. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact, was referring to BFD and the movie, according to Smith.

125. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction". See Exhibit G pg. 2.

126. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership. See Exhibit G pg. 2.

127. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory". See Exhibit G pg. 2.

128. Thus, the "partners" determined the underlying transaction was "null and void". See Exhibit G pg. 2.

129. The "partners" that being the members of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

130. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

131. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

132. The Defendants made each of the foregoing representations through the use of wire and mails to the Plaintiff to induce them to enter into the Agreements; and then later attempted to lead them to believe they never purchased the movie or BFD.

133. The representations made by the Defendants were material and relied upon by the Plaintiff in executing the Agreements and purchasing unregistered securities. The Defendants intended to deceive, manipulate and defraud the Plaintiff.

134. At the time the Defendants made the foregoing representations and opinions they were false or issued in recklessness in an extreme disregard from the standards of ordinary care.

135. Plaintiff reasonably relied thereon to their detriment and purchased the unregistered securities.

136. The Defendants representations and opinions directly led to the damages sustained by the Plaintiff.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants for violation of Section 12(a)(2) of the 1933 Act, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT IV**

California Corporate Code 25401

137. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

138. Defendants offered to the Plaintiff securities through by means of unlawful written and oral communication which contained material misrepresentations and/or omissions in violation of the California Corporate Code Section 25401.

139. As detailed above, the Defendants representations in connection with the unregistered securities were deliberately, intentionally and recklessly inaccurate.

140. Specifically, to induce the Plaintiff to acquire the movie the Purchase Agreement expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

141. According to Purchase Agreement the Plaintiff purchased the movie as well as all other related agreements, contracts, elements or components of the film production.

142. The Plaintiff's obligation to close on the purchase of the movie under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film.*

See Exhibit D ¶13.

143. In addition to title to the movie, Streamline and Thomasville represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

144. The movie was released in September of 2022.

145. The movie was a global streaming success, reaching number 1 on multiple platforms.

146. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report"). See Exhibit G.

147. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring BFD and the movie, according to Smith.

148. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction". See Exhibit G pg. 2.

149. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership. See Exhibit G pg. 2.

150. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory". See Exhibit G pg. 2.

151. Thus, the "partners" determined the underlying transaction was "null and void". See Exhibit G pg. 2.

152. The "partners" that being the members of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

153. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

154. The Defendants made each of the foregoing representations through the use of wire and mails to the Plaintiff to induce them to enter into the Agreements; and then later attempted to lead them to believe they never purchased the movie or BFD.

155. The representations made by the Defendants were material and relied upon by the Plaintiff in executing the Agreements and purchasing unregistered securities. The Defendants intended to deceive, manipulate and defraud the Plaintiff.

156. At the time the Defendants made the foregoing representations and opinions they were false or issued in recklessness in an extreme disregard from the standards of ordinary care.

157. Plaintiff reasonably relied thereon to their detriment and purchased the unregistered securities.

158. The Defendants representations and opinions directly led to the damages sustained by the Plaintiff.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants, jointly and severally, for violation of the California Corporate Code, Section 25401, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

## COUNT V

Breach of Contract- Streamline

(SPE Agreement)

159. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

160. Plaintiff and Streamline entered into several valid and enforceable contracts in 2021. Specifically, the Plaintiff and Streamline entered into the (i) SPE Agreement annexed as Exhibit D and (ii) the Purchase Agreement annexed as Exhibit B. Collectively the foregoing shall be referred to as the "Agreements".

161. Pursuant to the terms of the Agreements the Plaintiff agreed to pay Streamline and its predecessor the sum of $9,073,435 (the "Purchase Price") to purchase BFD and the movie.

162. In exchange for the foregoing consideration Streamline expressly represented in the SPE Agreement that:

> The Film is the only asset of the Film Company. The Film Company has no other debts of any kind and Buyer is not assuming any other debts related to or connected to the Film or Film Company other than the assumption of the Purchase Money Note owed to Thomasville Pictures LLC, in the amount of $14,633,687 and the performance and payment schedule provided in the Film Purchase Agreement. 'The acquisition of the Film Company *results in the transfer of all right, title and interest in and to the Film. The term all "right, title and interest" includes but is not limited to the ownership of the actual master Film file(s)* whether digital or stored on other media; the sound track; all recorded audio files; the copyright interest in the Film; the name of the Film; the script and all amendments; dailies, out-takes, behind the scenes footage; distribution and promotional rights; advertising and promotion materials; licensing rights; merchandising rights; state film tax credits (if any), and all other related materials of value used in the production of the Film. Seller agrees that by signing this Purchase Agreement, that it transferring, conveying and assigning its entire economic interest in the Film. Therefore, Seller agrees that Buyer is entitled to receive the distributions, allocations of income, gains, losses, deductions, credit, or similar items that are related to the Film production.

163. Moreover, the SPE Agreement stated that the movie was not encumbered by any other obligations, liens, judgments, debts, or encumbrances of any kind, other than obligations provided under the Performance and Payment Schedule.

164. Finally, to induce the Plaintiff to purchase BFD and the movie, Streamline and Halverson expressly represented that:

a) Seller has full power and authority to execute and deliver this Agreement and to perform Seller's obligations under it, and that this Agreement constitutes a valid and legally binding obligation of Seller.

b) Seller warrants that the execution and delivery of this Agreement and the consummation of the transaction will not constitute or result in a default under any other agreements.

c) Seller *owns the Film Company and the Film* (and all rights to the Film) *free and clear of any restrictions regarding transfer.*

165. In addition to title to the movie, Streamline further represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

166. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury a New York based law firm to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition, which is referred to as the Pillsbury Report.

167. The Pillsbury Report set forth a "hypothetical" factual summary which, in fact, was referring to BFD and the movie, according to Smith.

168. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction".

169. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership.

170. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory".

171. Thus, the "partners" determined the underlying transaction was "null and void".

172. The "partners" that being the member of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically, nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

173. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

174. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

175. At all relevant times the Plaintiff was in full compliance with the SPE Agreement.

176. Streamline has breached the SPE Agreement by failing to perform under the terms thereof, including but not limited to transferring title to the Plaintiff

177. As a consequence thereof the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against Streamline for breach of contract, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

///

///

**COUNT VI**

Breach of Contract-Streamline

(Purchase Agreement)

178. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

179. Plaintiff and Streamline entered into several valid and enforceable contracts. Specifically, the Plaintiff and Streamline entered into the (i) SPE Agreement annexed as Exhibit D and (ii) the Purchase Agreement annexed as Exhibit B.

180. Pursuant to the terms of the Agreements, the Plaintiff agreed to pay Streamline and its predecessor the sum of $9,073,435 (the "Purchase Price") to purchase BFD and the Movie.

181. To induce the Plaintiff to acquire the movie the Purchase Agreement expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

182. According to Purchase Agreement the Plaintiff and others purchased the Film as well as all other related agreements, contracts, elements or components of the Film production.

183. The Plaintiff's obligation to close on the purchase of the film under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film.*

See Exhibit D ¶13.

184. In addition to title to the movie, Streamline further represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

185. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report"). See Exhibit G.

186. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring BFD and the movie, according to Smith.

187. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction".

188. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership.

189. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory".

190. Thus, the "partners" determined the underlying transaction was "null and void".

191. The "partners", that being the member of BFD (the Plaintiff) never "determined" the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

192. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

193. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

194. At all relevant times the Plaintiff was in full compliance with the Purchase Agreement.

195. Streamline has breached the Purchase Agreement by failing to perform under the terms thereof, including but not limited to transferring title to the Plaintiff and others.

196. As a consequence thereof the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against Streamline for breach of contract, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

///

///

///

///

**COUNT VII**

Fraud

(All Defendants)

197. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

198. Plaintiff was a client of Smith and Pandora.

199. In the course of considering various business and investment opportunities the Plaintiff was referred to Smith for purposes of financial, tax and investment planning.

200. Smith and Pandora subsequently introduced and recommended that the Plaintiff invest in the acquisition of a film known as *Blood for Dust*

201. Smith explained to the Plaintiff that investing in the movie had an added financial and tax benefit afforded by the Internal Revenue Code ("IRC") Section 181.

202. The benefit of Section 181 is an immediate deduction for production costs that would be otherwise capitalized under the Internal Revenue Code.

203. According to Smith and Pandora on 181 permitted taxpayers to elect to deduct up to $15 million of production costs of a "qualified film," television production, or live theatrical production ($20 million if produced in certain distressed areas). Upon the advice and recommendation of Smith and Pandora the Plaintiff's agreed to enter into negotiations to purchase the film, *Blood for Dust* in part to obtain the benefits of Section 181 and because the cast selected projected a marketable film.

204. At the request of Smith and Pandora, Plaintiff permitted them to lead the negotiations to acquire BFD and the film *Blood for Dust* from Streamline.

205. At all relevant times, Smith and Pandora negotiated and guided the Plaintiff with respect to the purchase of BFD' unregistered securities and the movie, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; and (iv) advising Plaintiff with respect to ongoing tax matters.

206. To purchase BFD and the movie, Plaintiff agreed to pay the sum of $9,073,435 (the "Purchase Price") to Streamline at the recommendation of Smith and Pandora.

207. Smith and Pandora specifically advised each Plaintiff that the purchase price was fair and reasonable.

208. The Plaintiff and others contributed funds to capitalize the down payment and personally guaranteed all sums due under the Promissory Note.

209. Pursuant to the terms of the Agreements the Plaintiff and others agreed to pay Streamline and its predecessor the sum of $9,073,435 (the "Purchase Price") to purchase BFD and the Movie.

210. To induce the Plaintiff to acquire the movie the Purchase Agreement expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

211. According to Purchase Agreement the Plaintiff purchased the Film as well as all other related agreements, contracts, elements or components of the Film production.

212. The Plaintiff's obligation to close on the purchase of the film under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film*.

See Exhibit D ¶13.

213. In addition to title to the movie, Streamline, Smith and Pandora represented that the movie qualified for treatment under Section 181 of the IRC, which was an essential component of the transaction.

214. However, none of the foregoing was true.

215. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report").

216. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring BFD and the movie, according to Smith.

217. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction".

218. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership.

219. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory".

220. Thus, the "partners" determined the underlying transaction was "null and void".

221. The "partners" that being the member of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

222. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

223. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

224. At all relevant times the Plaintiff was in full compliance with the SPE Agreement, the Purchase Agreement, and the Assumption.

225. Defendant Blood for Dust Productions LLC at all relevant times represented that it had transferred title to Streamline. In fact, it induced Plaintiffs to assume the Promissory Note due them from Streamline to be assumed by the Plaintiff and others.

226. However, Streamline and Pillsbury now assert that such transfer never transpired.

227. The Defendants made each of the foregoing representations to the Plaintiff to induce them to enter into the Agreements.

228. At the time the Defendants made the foregoing representations they knew they were false.

229. Plaintiff reasonably relied on each of the foregoing representations made by the Defendants to their detriment.

230. Specifically, Plaintiff has been advised that they did not procure title to the movie.

231. As a consequence thereof, the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants, jointly and severally, for fraud, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT VIII**

Negligent Representation

232. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

233. Plaintiff was a client of Pandora.

234. In the course of considering various business and investment opportunities the Plaintiff was referred to Smith and eventually Pandora for purposes of financial, tax and investment planning.

235. Smith and Pandora subsequently introduced and recommended that the Plaintiff invest in the acquisition of BFD’ unregistered securities, which purportedly owned the rights to the film known as *Blood for Dust.* In fact, Smith and Pandora presented Plaintiff with a detailed “pitch deck” from defendant Streamline, explaining the benefits of such an acquisition.

236. Smith and Pandora explained to the Plaintiff that investing in the movie had an added financial and tax benefit afforded by the Internal Revenue Code (“IRC”) Section 181.

237. The benefit of Section 181 is an immediate deduction for production costs that would be otherwise capitalized under the Internal Revenue Code.

238. According to Smith and Pandora, IRC Section 181 permitted taxpayers to elect to deduct up to $15 million of production costs of a "qualified film," television production, or live theatrical production ($20 million if produced in certain distressed areas).

239. Upon the advice and recommendation of Smith and Pandora the Plaintiff agreed to enter into negotiations to purchase the film, *Blood for Dust*, in part to obtain the benefits of Section 181 and because the cast selected projected a marketable film .

240. At the recommendation of Smith and Pandora, Plaintiff permitted them to lead the negotiations to acquire BFD's unregistered securities and the film from Streamline.

241. At the recommendation of Smith and Pandora the Plaintiff and others organized BFD for purposes of holding title to the film.

242. At all relevant times, Smith and Pandora negotiated and guided the Plaintiff with respect to the purchase of the film, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; (iii) organizing and forming BFD and (iv) advising Plaintiff with respect to ongoing tax matters.

243. Smith and Pandora specifically advised each Plaintiff that the purchase price of $9,073,435 was fair and reasonable.

244. The Plaintiff contributed funds to capitalize the down payment and personally guaranteed all sums due under the Promissory Note.

245. Upon the advice, guidance and recommendation of Troy Smith and Pandora the Plaintiff entered into the following agreements:

(i) Agreement to Purchase Single Purpose Entity.

(ii) Agreement to Purchase Film.

(iii) Agreement to Assume Promissory Note.

(iv) Promissory Note.

(v) BFD Operating Agreement.

(vi) Distribution Agreement/

246. To induce the Plaintiff and others were acquiring the movie the Purchase Agreement expressly provided that the Streamline was selling to Buyer *all right, title and interest in and to the Film entitled "Blood for Dust*" hereinafter the "Film".

247. According to the Purchase Agreement the Plaintiff and others purchased the Film as well as all other related agreements, contracts, elements or components of the Film production.

248. The Plaintiff's obligation to close on the purchase of the film under the Purchase Agreement was expressly contingent on:

> Buyer's obligation to perform is subject to its receipt, in form and content satisfactory to Buyer, of copies of all documents evidencing Seller's chain of title such that Buyer is able to confirm that it is or will be the *sole, exclusive and absolute owner of the Film.*

249. Defendant Blood for Dust Productions LLC at all relevant times represented that it had transferred title to Streamline. In fact, it induced Plaintiffs to assume the Promissory Note due them from Streamline to be assumed by the Plaintiff and others.

250. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report").

251. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring BFD and the movie, according to Smith.

252. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction".

253. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership.

254. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory".

255. Thus, the "partners" determined the underlying transaction was "null and void".

256. The "partners" that being the member of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

257. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

258. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

259. At all relevant times the Plaintiff was in full compliance with the SPE Agreement, the Purchase Agreement, and the Assumption.

260. The Defendants made each of the foregoing representations to the Plaintiff to induce them to enter into the Agreements.

261. At the time the Defendants made the foregoing representations they knew, or should have known they were inaccurate.

262. Plaintiff reasonably relied on each of the foregoing representations made by the Defendants to their detriment.

263. As a consequence thereof the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants, jointly and severally, for negligent misrepresentation, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT IX**

Smith and Pandora

Professional Malpractice

264. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

265. Plaintiff was a client of Pandora.

266. Smith and Pandora introduced and recommended that the Plaintiff invest in the acquisition of a film known as *Blood for Dust.*

267. Smith and Pandora explained to the Plaintiff that investing in the movie had an added financial and tax benefit afforded by the Internal Revenue Code ("IRC") Section 181.

268. The benefit of Section 181 is an immediate deduction for production costs that would be otherwise capitalized under the Internal Revenue Code.

269. According to Smith and Pandora, IRC Section 181 permitted taxpayers to elect to deduct up to $15 million of production costs of a "qualified film," television production, or live theatrical production ($20 million if produced in certain distressed areas).

270. Upon the advice and recommendation of Smith and Pandora the Plaintiff agreed to enter into negotiations to purchase the film, *Blood for Dust*, in part to obtain the benefits of Section 181 and because the cast selected projected a marketable film.

271. At the recommendation of Smith and Pandora, Plaintiff permitted them to lead the negotiations to acquire the film *Blood for Dust* from Streamline.

272. At the recommendation of Smith and Pandora the Plaintiff and others organized BFD for purposes of holding title to the film.

273. At all relevant times, Smith and Pandora negotiated and guided the Plaintiff with respect to the purchase of the film, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; (iii) organizing and forming BFD and (iv) advising Plaintiff with respect to ongoing tax matters.

274. To purchase the film, Plaintiff and others agreed to pay the sum of $ $9,073,435 for *Blood for Dust* (the "Purchase Price") to Streamline at the recommendation of Smith and Pandora.

275. Smith and Pandora specifically advised each Plaintiff that the purchase price was fair and reasonable.

276. Upon the advice, guidance and recommendation of Smith and Pandora the Plaintiff entered into the following agreements:

(i) Agreement to Purchase Single Purpose Entity.

(ii) Agreement to Purchase Film.

(iii) Agreement to Assume Promissory Note.

(iv) Promissory Note.

(v) BFD Operating Agreement.

(vi) Distribution Agreement.

277. Based on information and belief, in or about the summer of 2025 Smith and Pandora retained Pillsbury to conduct an "evaluation" of the winding up of a "null and void" Section 181 Film Acquisition (the "Pillsbury Report"). See Exhibit G.

278. The Pillsbury Report set forth a "hypothetical" factual summary, which in fact was referring BFD and the movie, according to Smith.

279. According to the Pillsbury Report the "partners" had "doubts" as to the bona fides of the transaction and a "forensic review was conducted to assess the nature of the transaction". See Exhibit G pg. 2.

280. The Pillsbury Report continued by concluding that the "entity" never obtained true ownership of the film. Instead, the "entity's" rights were "limited" and failed to convey the benefits and burdens of ownership. See Exhibit G pg. 2.

281. The Pillsbury Report's "analysis" further determined that the "note obligation was illusory". See Exhibit G pg. 2.

282. Thus, the "partners" determined the underlying transaction was "null and void". See Exhibit G pg. 2.

283. The "partners" that being the member of BFD (the Plaintiff) never determined the "transaction" was "null and void". Critically nothing in the SPE Agreement indicated that BFD received "limited" rights to the movie; or failed to convey the benefits of ownership.

284. In October of 2025 Smith and Pandora disclosed the Pillsbury Report to the Plaintiff.

285. No "forensic" report was ever presented to the Plaintiff; and no explanation was given as to how the operative documents failed to transfer title.

286. At all relevant times the Plaintiff had entered into agreements, written or oral whereby Smith and Pandora served as their accountants and financial advisors.

287. As a result, Smith and Pandora each owed the Plaintiff a duty of care and loyalty. They further owed the Plaintiff the duty to exercise the skill, care and competence exercised by reasonably competent practitioners.

288. Smith and Pandora were responsible for and Pandora each represented that the Plaintiff had obtained "title" to the movie and were the rightful owner thereof.

289. Compounding the above Smith and Pandora advised the Plaintiff that the terms of the various Agreements were fair and reasonable and recommended they enter into the transaction.

290. Plaintiff reasonably relied on Defendants advice and guidance to their detriment.

291. As a consequence thereof the Plaintiff has been damaged.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants jointly and severally for professional malpractice, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

## COUNT X

Section 15 of the Securities Exchange Act of 1934

292. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

293. Section 15(a)(1) of the Securities Exchange Act of 1934 makes it unlawful for any broker or dealer to use the mails or any instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security — unless such broker or dealer is registered with the SEC under Section 15(a)(1) of the Securities Exchange Act of 1934.

294. Further, it is generally unlawful for any broker or dealer to use interstate commerce to sell or induce the purchase of securities unless they are registered with the SEC.

295. Based on the foregoing, neither Pandora nor Smith were registered as a broker dealer under Section 15(a)(1) of the Securities Exchange Act of 1934.

296. Further both Pandora and Smith solicited investors and coordinated the sale of unregistered securities in violation of Section 15(a)(1) of the Securities Exchange Act of 1934.

297. Smith and Pandora introduced, recommended and solicited the Plaintiff to invest in the acquisition of a film known as *Bandit.* In fact, Smith and Pandora presented Plaintiff with a detailed "pitch deck" from defendant Streamline, explaining the benefits of such an acquisition.

298. Upon the advice and recommendation of Smith and Pandora the Plaintiff's agreed to enter into negotiations to purchase the film, *Bandit*, in part to obtain the benefits of Section 181 and because the cast selected projected a marketable film .

299. At the recommendation of Smith and Pandora, Plaintiff permitted them to lead the negotiations to acquire the film *Bandit* from Streamline. Based on the information presented to the Plaintiff, Streamline had previously purchased the film from Blood for Dust Production LLC.

300. At the recommendation of Smith and Pandora, the Plaintiff organized BFD for purposes of holding title to the film.

301. At all relevant times, Smith and Pandora negotiated and guided the Plaintiff with respect to the purchase of the film, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; (iii) organizing and forming BFD and (iv) advising Plaintiff with respect to ongoing tax matters.

302. The purchase price was paid by Plaintiff and others in the amount of $9,073,435.

303. Smith and Pandora specifically advised Plaintiff and others that the purchase price was fair and reasonable.

304. Upon the advice, guidance and recommendation of Smith and Pandora the Plaintiff entered into the following agreements:

(i) Agreement to Purchase Single Purpose Entity

(ii) Agreement to Purchase Film.

(iii) Agreement to Assume Promissory Note.

(iv) Promissory Note.

(v) BFD Operating Agreement.

(vi) Distribution Agreement.

305. Plaintiff each purchased the securities based on the solicitation and recommendation of Pandora and Smith.

306. By and through their actions set forth above the Defendants violated Section 15 of the Securities Exchange Act of 1934.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants, jointly and severally, for violation of Section 15 of the Securities Exchange Act of 1934, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**COUNT XI**

California Corporations Code §25210

307. Plaintiff repeats the allegations of the preceding paragraphs as if set forth herein at length.

308. Under California Corporations Code § 25210, conducting business as a broker-dealer without securing a certificate from the Department of Financial Protection and Innovation (DFPI) is illegal. Under § 25110, the offer or sale of securities is prohibited unless qualified or exempt.

309. Based on the foregoing, neither Pandora, nor Smith were registered as a broker dealer under §25110.

310. Further both Pandora and Smith solicited investors and coordinated the sale of unregistered securities in violation of the foregoing.

311. In fact. Smith and Pandora introduced, recommended and solicited the Plaintiff to invest in the acquisition of a film known as *Bandit.* In fact, Smith and Pandora presented Plaintiff with a detailed "pitch deck" from defendant Streamline, explaining the benefits of such an acquisition.

312. Upon the advice and recommendation of Smith and Pandora the Plaintiff agreed to enter into negotiations to purchase the film, *Bandit*, in part to obtain the benefits of Section 181 and because the cast selected projected a marketable film.

313. At the recommendation of Smith and Pandora, Plaintiff permitted them to lead the negotiations to acquire the film *Bandit* from Streamline. Based on the information presented to the Plaintiff, Streamline had previously purchased the film from Blood for Dust Production LLC.

314. At the recommendation of Smith and Pandora the Plaintiff and others organized BFD for purposes of holding title to the film.

315. At all relevant times, Smith and Pandora negotiated and guided the Plaintiff with respect to the purchase of the film, including (i) reviewing and negotiating the terms of various acquisition and related agreements; (ii) performing necessary due diligence; (iii) organizing and forming BFD and (iv) advising Plaintiff with respect to ongoing tax matters.

316. To purchase the film, Plaintiff agreed to pay the sum of Purchase Price to Streamline at the recommendation of Smith and Pandora.

317. Smith and Pandora specifically advised Plaintiff that the purchase price was fair and reasonable.

318. Upon the advice, guidance and recommendation of Smith and Pandora the Plaintiff entered into the various purchase agreements to consummate the transaction.

319. Plaintiff each purchased the securities based on the solicitation and recommendation of Smith and Pandora.

320. By and through their actions set forth above the Defendants violated Section the foregoing provisions of California law.

*WHEREFORE*, Plaintiff seeks judgment against the Defendants jointly and severally for violation of Section 15 of the Securities Exchange Act of 1934, damages, attorney fees, costs of suit and such other relief as the Court deems just and proper.

**Plaintiff Demands a Trial by Jury**

Respectfully Submitted:

/s/ Matthew Kumin
Matthew Kumin Esq.
Attorney for Plaintiff